## COMMONWEALTH vs. KEVIN QUINN.

No. 11-P-1910.

Essex. December 7, 2012. - June 19, 2013.

Present: CYPHER, BROWN, & COHEN, JJ.

Further appellate review granted, 466 Mass. 1106 (2013).

*Rape. Practice, Criminal,* Cross-examination by prosecutor. *Evidence,* Cross-examination, Communication with social worker, Expert opinion, First complaint, Relevancy and materiality. *Rape-Shield Statute. Witness,* Expert.

At the trial of indictments charging the defendant with forcible rape of a child and indecent assault and battery on a child, a licensed clinical social worker who had counselled the victim did not expressly vouch for the victim when the social worker testified that the victim was not malingering, where that determination related to whether the victim had faked her symptoms of anxiety and depression in order to avoid school during the previous week, and was divorced from any claim or suspicion of sexual abuse [763-764]; similarly, the social worker did not implicitly vouch for the victim's credibility by providing a list of symptoms generally observed in sexually abused children and a list of symptoms the social worker saw in the victim (which were similar but not identical to the generalized list), where the social worker did not actually link the general experience of sexually abused children to the experience of the victim [764-766].

At the trial of indictments charging the defendant with forcible rape of a child and indecent assault and battery on a child, the judge properly declined permission to the defendant to ask the victim whether she was pregnant at the time she disclosed the abuse, where the probative value of such marginally relevant evidence did not outweigh the prejudicial impact. [766-767]

INDICTMENTS found and returned in the Superior Court Department on August 29, 2007.

The cases were tried before *Leila R. Kern,* J.

*Eric S. Brandt,* Committee for Public Counsel Services, for the defendant.

*Catherine Langvin Semel,* Assistant District Attorney, for the Commonwealth.

CYPHER, J. After a mistrial, the defendant, Kevin Quinn, was retried before a jury and the same Superior Court judge and was

convicted of forcible rape of a child and two counts of indecent assault and battery on a child. On appeal, the defendant argues, first, that the prosecutor's cross-examination of the victim's therapist exceeded the permissible bounds of expert testimony; and second, that it was error to exclude evidence that the victim was pregnant when she made her first complaint of sexual assault by the defendant. We affirm.

*Factual background.* We summarize the facts the jury could reasonably have found, reserving certain details for discussion with the specific issues raised. The victim was about seven years old at the time of the incidents. The defendant was her mother's boyfriend, and the three lived together for a total of about ten years. The abuse occurred when they were living on Spruce Street in Lawrence from about July, 1997, until December, 1998.

The victim testified that during this period, three incidents occurred, all in the evening before bedtime, and all in largely the same way. The defendant would join the victim in her playroom, which was a long, large closet off the kitchen where the victim could play with and store her toys. The defendant would grab her under her nightclothes, touch her chest, and put his hands in her underwear and "all over [her] body." She testified that on each of the three occasions, the defendant put his finger into her vagina. She said it hurt and that she cried and tried to push him away. During the last incident, the victim testified that the defendant forced her hand onto his penis and moved it up and down as she tried to pull away.

When the victim was able to pull away, she told the defendant she was "going to tell [her] mom." She testified the defendant threatened to kill her and her mother if she said anything. She was very frightened because she believed him.

These incidents did not appear to affect her academically, as she continued to do very well throughout elementary school. While she was in elementary school, her mother and the defendant had a son together in December, 2000.

By 2004, however, the victim began to encounter some personal difficulties. Specifically, on or about July 22, 2004, when the victim was thirteen years old, her mother discovered

that she had been cutting herself on her wrists.[1] On the advice of their pediatrician, the victim's mother brought the victim to the hospital emergency room. En route, they stopped at the defendant's workplace and spoke to him. He came out to the car and began yelling at the victim, telling her she was stupid and that "[i]f [she] really wanted to die [she] could do it right . . . [and] cut the other way." He also told her "not to tell anybody anything bad" and that if she did, she "would be taken away from [her] mom."

About a year later, midway through ninth grade (2005 to 2006), the victim encountered additional problems. An older female student began to bully her, and as a result, the victim no longer wanted to go to school. The difficulty with her fellow students only worsened in the tenth grade when, as other students threatened to beat her up, she became even more reluctant to go to school, and her grades fell. In October of tenth grade (2006), the victim began therapy with Grace Ireland, a licensed clinical social worker, and eventually was removed from her classes. Arrangements were made so that she could spend the school day in three different sessions, solely with a supervising adult. At the end of the year, the victim transferred to a private school where she did well and graduated in 2009, without further difficulties.

The circumstances leading up to the disclosure of the abuse in 2007 were as follows. The victim's mother and the defendant broke up in July, 2006, and the defendant moved out of the home. For the next eleven months, the victim seldom saw or had any contact with the defendant. In June, 2007, however, contact increased. On Father's Day, the victim, her family, and her boyfriend at the time spent the day with the defendant in New Hampshire. That night, the defendant stayed at the victim's home so he could attend his son's kindergarten graduation ceremony the following morning, June 18, 2007.

The victim testified that she did not want the defendant to return and she was concerned that his increased contact with the family signaled that her mother was going to take him back. She readily acknowledged that she never liked him and that she

---

[1]The victim testified she cut her wrists because she "hated [herself] . . . because of everything that went on with [the defendant]."

had never gotten along with him. He frequently yelled at her and imposed discipline that even her mother considered unfairly strict.

On June 21, 2007, the victim went to the beach with her boyfriend. The boyfriend initiated a conversation in which he confided to her that he had been beaten by his father, following which the victim became very upset. The boyfriend asked several times about her own childhood. He persisted until finally she told him she had been raped as a child by the defendant. Although the victim asked him not to tell anyone about the assault, later that day the boyfriend told the victim's mother.

Through witnesses, cross-examination, and argument, the thrust of the defense was that the victim had fabricated the complaint to prevent the defendant from returning to live with the victim's family. In support of this theory, the defense emphasized that despite having been in counselling during the year preceding the disclosure, as well as during the time period that the disclosure was made, and having had regular opportunities to speak confidentially with adults because of her individualized education plan, the victim said nothing about the abuse until school was over. The defense also pointed to the victim's failure to report any threats to her therapist or to police, doing so only during the first trial in 2010, arguing that this belated attempt to gild the lily was further proof that she ought not be believed.

1. *The scope of the prosecutor's cross-examination.* Among the witnesses called by the defendant was Ireland, a licensed clinical social worker, who had counselled the victim on an approximately weekly basis from October, 2006, to June, 2007. The strategic purpose of calling Ireland was as follows: first, she was to provide testimony that she had specifically asked the victim whether she had ever been sexually abused and that the victim had said, "No."[2] Second, Ireland's testimony was to counter the evidence that the abuse resulted in a trip to the hospital in 2004, by showing that the victim had significant and persistent problems in school that were related entirely to bully-

---

[2]The victim's last visit to Ireland was the day after she disclosed the abuse to her boyfriend, and during that session she told Ireland about the sexual assaults despite having denied sexual abuse prior to that visit.

ing and interactions with her peers, rather than the purported sexual abuse. After offering this explanation in a bench conference that preceded Ireland's testimony, the defendant sought advance assurance that the Commonwealth would not be permitted "to use the witness as a full expert and get into symptoms and posttraumatic stress and things of that nature."

The judge informed defense counsel that "[r]ight now [without Ireland] there is no expert who is testifying" to what the judge, in essence, explained were the general behavioral characteristics or syndromes of sexually abused children. The judge correctly warned the defendant that if Ireland were called as a witness, the door would be opened on cross-examination to "exactly" that type of testimony. See *Commonwealth* v. *Bibby*, 35 Mass. App. Ct. 938, 940 (1993) ("What is permissible scope of cross-examination is within the sound discretion of the trial judge," guided by the general principle that "in Massachusetts, a party may cross-examine as to all aspects of the case"); Mass. G. Evid. § 611(b)(1) (2013).

Even with this admonition, the defendant elicited Ireland's testimony as proffered. The testimony included that the victim had been referred to Ireland for anxiety, depression, and an inability to attend classes, and also included substantial detail regarding the victim's difficulties with her peers at school. At the conclusion of Ireland's direct examination, it was apparent that counselling had been obtained solely for the purpose of addressing the victim's problems related to her social interactions at school and that, despite a fairly lengthy course of therapy, the victim never told Ireland that she had been sexually assaulted.

a. *Explicit vouching.* During cross-examination, the prosecutor established Ireland's training and her seventeen years of experience with children, adolescents, and adults "who have been traumatized," whether by sexual abuse, physical abuse, or otherwise, as well as those who suffer from, perhaps as a result of trauma, anxiety and depression. The prosecutor elicited specific confirmation from Ireland that she was trained and experienced in treating individuals who had been sexually abused. In response to further questioning by the prosecutor, Ireland explained that she had been trained to identify malingering or when someone fakes their symptoms. She testified that as part of her initial

evaluation of the victim, she determined that the victim was not faking her symptoms of anxiety and depression.

For the first time on appeal, the defendant argues that this testimony constituted express vouching for the victim. According to the defendant, the statement that the victim was not malingering had the "effect" of conveying to the jury that she was "not faking her allegations." Compare *Commonwealth* v. *Trowbridge*, 419 Mass. 750, 759-760 (1995) (expert must not express an opinion whether abuse in fact occurred or comment on the credibility of the victim). We disagree.

Ireland's determination that the victim was not malingering was made during their initial meeting and related to whether the victim had faked her symptoms of anxiety and depression in order to avoid school during the preceding week. The victim's referral to Ireland was divorced from any claim or even any suspicion of sexual abuse, and it was clear to the jury that the victim did not disclose that she had been sexually abused until almost nine months after this initial visit. In this context, the jury could not have interpreted Ireland's conclusion that the victim was truly symptomatic in October, 2006, and not malingering, as somehow suggesting that Ireland credited the victim's later allegations of abuse.

Moreover, even if we were to assume that Ireland's opinion was improper, it was not unduly prejudicial, much less a substantial risk of a miscarriage of justice. Ireland's conclusion that the victim was not malingering gave credence to the evidence that the victim suffered from anxiety and depression because of social difficulties at school.

b. *Implicit vouching*. The defendant argues that Ireland implicitly vouched for the victim's credibility when, over objection, she provided a list of symptoms generally observed in sexually abused children and also a list of symptoms that she saw in the victim, which were similar but not identical to the generalized list. Since Ireland did not actually link the general experience of sexually abused children to the experience of the child victim here, her testimony falls short of what decisional law characterizes as impermissible vouching. See *Commonwealth* v. *Quincy Q.*, 434 Mass. 859, 872-873 (2001) (no error where the expert witness did not link the general characteristics of

sexually abused children to the experience of the child victim). Contrast *Commonwealth* v. *Trowbridge*, 419 Mass. at 760 (testimony that the symptoms "of the child were consistent with the type of nonviolent sexual abuse that the child alleged in this case . . . [comes] impermissibly close to an endorsement of the child's credibility"). Nor did Ireland express an opinion whether the abuse occurred or on the credibility of the victim, further distinguishing her testimony from that which is improper. See *Commonwealth* v. *Allen*, 40 Mass. App. Ct. 458, 465-466 (1996) (no error where a treating physician testified about her findings from her examination of the victim and general syndromes, e.g., a lack of physical findings, associated with sexual abuse because she was not asked to render an opinion whether the child had been sexually abused, nor did she give such an opinion in her testimony).

We pause to note that we are not convinced of the defendant's claim that Ireland's testimony carried undue weight because she was the victim's therapist. She was not treating the victim for sexual abuse, and in any event, "we have not gone so far as to hold that it would never be permissible for a treating therapist to give expert testimony." *Id.* at 467. Nor are we convinced, as the defendant contends, that Ireland's testimony tipped the scales in favor of a guilty verdict at this trial, as evidenced by its omission from the first trial that ended in a deadlock. Not only was Ireland not called as a witness at the first trial, but also omitted from the first trial was the fairly devastating evidence that the victim had cut her wrists in 2004 because of feelings of worthlessness related to the abuse and that, on her way to the hospital for treatment, the defendant had warned her not to tell anyone about the abuse or she would never see her mother again.

More importantly, we cannot ignore that the challenged testimony was given during cross-examination of a defense witness. The defense used Ireland to bolster its theory that the victim was lying because she had not disclosed the sexual abuse to her therapist, with whom she had a long-standing relationship. The defense also elicited a description of the victim's symptoms and problems in a manner that suggested they were not caused solely by taunting at school. In these circumstances, the prosecutor properly sought information that showed why the victim

may have delayed disclosing the abuse, to rebut the implication that her symptoms or behavioral characteristics were limited only to school interactions, and to show that similar symptoms are also exhibited by children who had been sexually assaulted. See *Commonwealth* v. *Bibby*, 35 Mass. App. Ct. at 940-941 (prosecutor may seek information on cross-examination that fills out the setting of the alleged crimes and assists the jury in evaluating the credibility of the allegations). See also *Commonwealth* v. *Anestal*, 463 Mass. 655, 669-670 (2012) (expert may be properly cross-examined on matters that are probative, provided the evidence is not unduly prejudicial, and on matters that "shake" the foundation of the expert's opinion or testimony).

The right to present a defense "does not confer the right to present testimony free from the legitimate demands of the adversary system," nor may that right be invoked "as a justification for presenting what might have been a half-truth." *Commonwealth* v. *Ranieri*, 65 Mass. App. Ct. 366, 368 (2006), quoting from *United States* v. *Nobles*, 422 U.S. 225, 241 (1975). Considering that neither the expert nor the prosecutor linked any of the victim's particular symptoms to those typical of sexually abused children and that the defendant was warned that presenting Ireland as a witness could open the door to this kind of testimony, the judge did not abuse her discretion in admitting the evidence. See and compare *Commonwealth* v. *Appleby*, 389 Mass. 359, 376, cert. denied, 464 U.S. 941 (1983) (no error in the admission of a letter in rebuttal to defense questioning where the defendant had been warned that such questioning might open the door to its admission).

2. *Exclusion of evidence of pregnancy.* Before trial, the defendant filed a motion in limine seeking permission to ask the victim if she was pregnant at the time she disclosed the abuse, based on medical records the defense had obtained. The defendant argued that such evidence demonstrated a bias or motive on the victim's part to lie about the abuse in order to keep the defendant out of the home because of the negative repercussions to her if he returned home and learned that she was pregnant. The judge ruled that the probative value did not outweigh the prejudicial impact, particularly in light of the legislative policy prohibiting such evidence embodied in the rape shield statute. The defendant argues that this ruling was error.

Commonwealth *v.* Quinn.

The rape shield statute precludes the admission of reputation evidence concerning the victim's sexual conduct and "[e]vidence of specific instances of a victim's sexual conduct." G. L. c. 233, § 21B, as appearing in St. 1983, c. 367. See Mass. G. Evid. § 412. Here, powerful evidence of the victim's long-standing dislike of the defendant and her desire to keep him out of the home was adduced at trial and in these circumstances, we agree with the judge that there was little to be gained by piercing the rape shield statute to admit this marginally relevant evidence.

*Judgments affirmed.*